EXHIBIT B

**Oscar L. Hampton III**

**v.**

**Julie Su,**
**Acting Secretary,**
**U. S. Department of Labor,**
**Agency**

**ARB Case No. 2023-0020; CRC Case No. 23-03-040**

**DATE ISSUED: October 25, 2023**

---

**FINAL AGENCY DECISION**

---

## I. Statement of Claims

Complainant was a Regional Solicitor, a Senior Executive Service (SES) position, with the Department of Labor's (DOL) Office of the Solicitor (SOL). Complainant alleged that he was subjected to unlawful disparate treatment and/or a hostile work environment based on his race (black), sex (male), and/or in reprisal for prior EEO activity.

## II. Procedural History

On December 21, 2022, Complainant initiated contact with an EEO Counselor.[1] On February 2, 2023, Complainant filed a formal complaint of discrimination with the Civil Rights Center (CRC).[2] Because of a potential conflict of interest, the CRC transferred the complaint to the Administrative Review Board (ARB) for processing on March 7, 2023.[3]

On March 15, 2023, the ARB issued an Acceptance Letter, which listed five claims accepted for investigation based on the February 2, 2023, formal complaint in this matter.[4] The ARB accepted the following issues for investigation:

**Whether the DOL's Office of the Solicitor (SOL) subjected you to unlawful disparate treatment and/or a hostile work environment**

---

[1]     Report of Investigation (ROI) at 8, 21.

[2]     ROI at 1.

[3]     ROI at 7.

[4]     ROI at 47.

based on your race (black), sex (male), and/or in reprisal for
protected activity when:

1. On November 10, 2022, DOL issued you a "Notice of Detail
   and No Contact Order" removing you from your duties as
   Regional Solicitor and detailing you "to a position of
   unclassified duties with the SOL Front Office, effective
   immediately."
2. On December 1, 2022, DOL gave you a negative
   performance review.
3. In December 2022, DOL denied you a full bonus and raise.
4. In or around December 2022, DOL proposed your removal
   from federal service.
5. DOL has subjected you to an ongoing pattern of
   discriminatory disparate treatment, including:
   a. Stereotyped criticism, increased scrutiny, and
      repeatedly holding you to different standards than
      Caucasian attorneys: while DOL awards Caucasian
      attorneys for showing skills like trial advocacy,
      leadership, and obtaining victories for DOL, DOL
      penalizes you and Black attorneys for the same traits,
      labeling them with negative stereotypes such as
      aggressive, confrontational, angry, and overbearing.
   b. Stereotyped criticism, increased scrutiny, and
      repeatedly holding you to different standards than
      Caucasian managers when you act in your
      managerial capacity, including assessing
      performance, making decisions about cases, work
      assignments, discipline and promotions.
   c. Biased, discriminatory assumptions that when there
      are workplace disputes, Caucasian employees are
      believed, and the Black employees, including you, are
      lacking credibility, at fault, and/or have engaged in
      misconduct.
   d. Subjecting you to administrative investigations
      (conducted by DOL's OASAM/OHR/DELMR) regarding
      discriminatory allegations made by Caucasian staff,
      including in November 2022 and January 2023.[5]

ARB accepted Claims 1-4 as claims of disparate treatment on all bases alleged.[6]
ARB accepted subparagraphs (a)-(d) of Claim 5 as claims of disparate treatment on

---

[5]    ROI at 48-49.

[6]    ROI at 49.

all bases alleged if the action alleged in the particular subparagraph occurred within 45 days of Complainant's initial contact with an EEO Counselor on December 21, 2022.[7] In addition, ARB accepted Claim 5 as an allegation of hostile work environment on all bases alleged.[8]

The complaint was investigated, and the ARB issued its Report of Investigation (ROI) to Complainant on July 31, 2023. In the ROI cover letter, I advised Complainant of his right to either request a hearing with the EEOC or an immediate final decision from the Department of Labor. Complainant did not respond. Accordingly, the ARB is issuing this final decision.[9]

After a careful review of the investigative report, the record, Complainant's arguments and the relevant law, I find that Complainant has failed to prove disparate treatment, retaliation, or harassment.

## III. Statement of Facts

### A. Background

Complainant was a Regional Solicitor (RSOL), SES, with SOL. Complainant's first line supervisor was S1, the Deputy Solicitor for Regional Enforcement, and Complainant's second line supervisor was S2, the Solicitor of Labor. Complainant stated that his race is Black and his sex is male.[10] He has engaged in prior EEO activity, which involved S1 and S2.[11] Complainant was RSOL for Region III, which has offices in Philadelphia, Pennsylvania and Arlington, Virginia, since 2014.[12]

S1 identifies as a Caucasian male.[13] S1 has occupied his position since on or about March 3, 2021.[14] He was in an acting capacity until October 1, 2021, at which

---

[7]     ROI at 49. EEOC regulation 29 C.F.R. § 1614.105(a)(1) requires that complaints of discrimination be brought to the attention of the EEO Counselor within forty-five (45) days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within forty-five (45) days of the effective date of the action.

[8]     ROI at 49.

[9]     29 C.F.R. § 1614.110(b).

[10]    ROI at 2.

[11]    ROI at 4, 5.

[12]    ROI at 222.

[13]    ROI at 311.

[14]    ROI at 309.

point he officially became the Deputy Solicitor for Regional Enforcement.[15] S1 did not indicate when he became aware of Complainant's race, gender, or EEO activity.

S2 identified as an Asian Indian female.[16] S2 was not sure when she became aware of Complainant's race and gender, but states she first met him via a Zoom meeting in July 2021, shortly after she started her job.[17] S2 knew of prior EEO complaints from Complainant shortly after she began in her role in 2021.[18] S1 and S2 and are part of SOL's Front Office (FO).[19]

The events relevant to this case began in 2020 and end in June 2023. Complainant's testimony covers that entire timeline, including some events that occurred prior to 2020. S1's affidavit provided a very detailed timeline of many of the events at issue in Complainant's complaint, covering early 2021 through June 2023. S2's affidavit provides additional testimony for the time period from late 2021 through June 2023. A timeline of relevant events is included here as background.

## 1. *Timeline of Events*

In 2020, the Agency conducted an audit of Complainant's government travel card (GTC).[20] That audit prompted an investigation by the Office of Inspector General (OIG), which revealed "approximately $36,000 in questionable transactions for the period of August 2016 to March 2020."[21] Due to ambiguities in the OIG investigation, an investigation into Complainant's GTC usage was initiated by SOL, to be conducted by the Office of the Assistant Secretary for Administration and Management (OASAM).[22]

In February or early March 2021, S1 first learned of OASAM's investigation into Complainant's GTC usage when he became Acting Deputy Solicitor for Regional Enforcement.[23]

---

[15]     ROI at 309.

[16]     ROI at 936.

[17]     ROI at 937.

[18]     ROI at 937.

[19]     ROI at 312.

[20]     ROI at 509.

[21]     ROI at 509.

[22]     ROI at 313.

[23]     ROI at 313.

On August 23, 2021, the Federal Employee Viewpoint Survey (FEVS) results for the regional offices became available to the FO and were distributed to each region.[24] The results for Complainant's region in the areas of senior leadership and fear of reprisal were concerning to the FO.[25]

In September 2021, Region III filed a lawsuit against a federal contractor (the OFCCP lawsuit).[26] Other regions were preparing to file similar lawsuits against the same contractor, but given budget limitations, only one expert witness could be selected for the regions to rely upon in their suits.[27] Region III was the first region to file its suit, and thus, needed the expert sooner than other regions. S1 instructed Complainant to work with the other RSOLs to select the expert.[28] Complainant complained to S1 about the requirement to collaborate on selecting an expert, and as part of that conversation told S1 that SOL was a hostile work environment to Black attorneys.[29] S1 stated he found Complainant's reference to "hostile work environment to be largely occasioned by my directing him to do something he did not want to do and I felt like I needed to follow the Department's Harassment Policy."[30] S1 alerted Complainant to his rights under that policy.[31] On September 29, 2021, Complainant responded with an e-mail stating that his comments were private, not related to him specifically, and "I don't need to be rescued by anyone."[32]

On October 1, 2021, S1 officially became Deputy Solicitor for Regional Enforcement.[33] On that same day, S1 received an e-mail from A1, an attorney in Region III, stating that, if the FEVS results were "disconcerting enough that they prompt some inquiry", "I and some other long-time RSOL attorneys would be happy to speak to you."[34] That evening, S1 had a phone call with A1, and took contemporaneous notes, which he memorialized in an e-mail to himself.[35] The crux

---

[24]     ROI at 313.

[25]     ROI at 313.

[26]     ROI at 313.

[27]     ROI at 313.

[28]     ROI at 313.

[29]     ROI at 313.

[30]     ROI at 313.

[31]     ROI at 313.

[32]     ROI at 452.

[33]     ROI at 313.

[34]     ROI at 454.

[35]     ROI at 456.

of A1's complaints were that Complainant's region was a "toxic and dysfunctional workplace" and that Complainant was a "classic workplace narcissist boss."[36] A1 stated that Complainant can be unethical and pressure attorneys, which results in either their giving into the pressure or risk getting removed from a case.[37] A1 detailed the departure of several attorneys from Region III, all of which he blamed on Complainant's management.[38] He also described Complainant as "so sexist" and said Complainant described women as "hot."[39] A1 asked S1 what was stopping the FO from speaking with every attorney in the region.[40]

A1 spoke with S1 several times more times in October 2021 to discuss various problems expressed by Complainant's staff. S1 memorialized the calls with A1 in e-mails to himself, which were included as attachments to his affidavit.[41]

On October 4, 2021, the FO directed all divisions and regions to develop an Action Plan in response to their FEVS results.[42]

On October 29, 2021, S2 shared an anonymous letter she received with S1.[43] It stated:

> I currently work for the Solicitor's Office, but decline to give my name out of fear of retribution. All I can tell you is that I am an attorney who currently works for, or used to work in, the Philadelphia region.

> You recently said at a meeting I attended that you were concerned about the exit of so many attorneys from the Solicitor's Office. With regards to the many attorneys that have left the Arlington or Philadelphia offices, I can tell you why: [Complainant].

> [Complainant]'s appointment as the Regional Solicitor of the Philadelphia region has been a catastrophe for the attorneys, and often the administrative staff, that have reported to him. He is rude, imperious, overbearing, and demeaning. He is one of the most toxic personalities I have ever met. He interprets any disagreement with

---

[36]     ROI at 456.

[37]     ROI at 456.

[38]     ROI at 456.

[39]     ROI at 456.

[40]     ROI at 458.

[41]     ROI at 454-468.

[42]     ROI at 315, 460-461.

[43]     ROI at 315.

him as insubordination, and any unwillingness to approach litigation with as an aggressive approach as his as weakness. His appointment to Regional Solicitor has led to the retirement, transfer, or resignation of so many excellent attorneys from the Solicitor's Office who could have formed a core group of staff in the future.

Many attorneys have complained about his behavior before, but to no avail. The front office simply chooses to ignore his outrageous behavior and permit his staff to suffer. When I first joined the Solicitor's Office I was impressed by the camaraderie of the Solicitor's Office and the respect it held for its attorneys and administrative staff.  That belief has been shaken by [Complainant]'s appointment and tenure.

I must be frank and say that I doubt the Front Office will take any action, but at least it cannot say that it does not know about the problem.[44]

On November 19, 2021, S1 met with Complainant and his managers about their proposed Action Plan for the FEVS results.[45] Thereafter, on November 21, 2021, S1 sent his comments on the meeting to Complainant and his managers, which noted that the FO was concerned about the negative response to the question "I can disclose a suspected violation of any law, rule or regulation without fear of reprisal" and low scores on questions related to senior leadership.[46]

In November 2021, S1 and S2 determined that an investigation into Complainant's management practices was necessary in light of the conversations with A1, the anonymous letter, the poor FEVS results in Complainant's region, and Complainant's response to the FEVS results (the management investigation).[47] On December 3, 2021, Complainant was informed of the management investigation.[48]

On December 16, 2021, S1 approved the Philadelphia Region Action Plan in response to the FEVS.[49]

---

[44]     ROI at 472.

[45]     ROI at 316.

[46]     ROI at 480.

[47]     ROI at 316-317.

[48]     ROI at 483-485.

[49]     ROI at 318.

On February 4, 2022, A2 e-mailed S1 in response to a request that SOL staff complete a survey called the PULSE survey asking for their opinion.[50] In his e-mail, A2 stated, "from someone who worked in the Philadelphia region and has had to watch the carnage unfold in that region under its current leadership over the past decade, to have someone tell me that our voice matters rings hollow."[51]

On February 14, 2022, S1 and A2 spoke on the phone.[52] A2 stated that Complainant was a bully and wants to discipline people for disagreeing with him.[53] A2 transferred out of Complainant's region because of Complainant, and A2 believed that another attorney in Philadelphia would retire soon because of Complainant's behavior.[54]

On February 16, 2022, Complainant e-mailed S1 to complain about the instruction to work with other regions in selecting an expert for the OFCCP lawsuit.[55] In the lengthy e-mail, Complainant stated that having to agree on an expert was an "unprecedented usurpation of the authority of a RSOL," argued that he handled cases differently from other Regional Solicitors, and stated that "there has been a great deal of scrutiny regarding how I have conducted myself."[56] He implied the scrutiny was due to "in-affinity preference."[57]

On February 28, 2022, S1 spoke with A1 again.[58] A1 expressed concern about the anonymity of a survey sent to Region III staff as part of the FEVS Action Plan.[59] After the call, S1 contacted the Deputy Regional Solicitor, an individual who reported directly to Complainant, to emphasize the importance of anonymity with the survey.[60]

---

[50]    ROI at 319, 555.

[51]    ROI at 555.

[52]    ROI at 319.

[53]    ROI at 557.

[54]    ROI at 557.

[55]    ROI at 558.

[56]    ROI at 561.

[57]    ROI at 561.

[58]    ROI at 320.

[59]    ROI at 320.

[60]    ROI at 320.

In March 2022, S1 spoke with A1 again about the regional survey.[61] A1 reported that Complainant was dismissive of concerns expressed by an attorney during a staff meeting about the anonymity of the survey, and that after the meeting, the attorney's managers were unusually scrutinizing her work.[62]

On March 8, 2022, Complainant complained to S1 that employee requests for transfers were being discussed with the receiving office without first being vetted through Complainant.[63] He also complained about the Honors Attorney program.[64] S1 stated that it is common for managers losing employees to another office to complain that they do not know about a transfer first.[65]

On March 12, 2022, S2 sent the results of the investigation into Complainant's GTC to S1.[66] Around this same time, in March 2022, a recommending official (RO) from outside SOL was selected to review the results of both the GTC investigation and the management investigation when it was completed.[67]

During April and May 2022, a new Deputy Regional Solicitor for Complainant's region was selected and announced. Although S1 and the outgoing Deputy Regional Solicitor participated in the interviews, Complainant did not consult them when he recommended a candidate to S2.[68] After S2 approved Complainant's selection, Complainant announced it via e-mail to SOL and included a line in his e-mail stating that the former Regional Solicitor had refused to hire the newly promoted Deputy Regional Solicitor to a permanent position when she was a temporary employee.[69] This e-mail prompted complaints, and a letter from the former Regional Solicitor to S2 requesting a correction to what the former Regional Solicitor characterized as an inaccurate statement.[70]

---

[61]    ROI at 320.

[62]    ROI at 320.

[63]    ROI at 320.

[64]    ROI at 320.

[65]    ROI at 320.

[66]    ROI at 320.

[67]    ROI at 321.

[68]    ROI at 321.

[69]    ROI at 322, 577.

[70]    ROI at 322, 579-580.

On May 26, 2022, Complainant provided an update on his region's FEVS Action Plan, which included the results of an internal survey.[71] The results indicated that approximately 12 employees provided an identical statement in response to the survey:

> We are summarizing our concerns about the office in this manner because we want to ensure that we remain anonymous. This response is directed toward SOL Region III's "senior management," in particular the Regional Solicitor, and to a lesser extent the Deputy Regional Solicitor and Associate Regional Solicitor. The results of the FEVS are accurate and representative not only of those who responded, but of the majority of non-management attorneys in the office, including us. We are providing this honest assessment of managers, despite our fear of retaliation, because we believe that this office would be greatly improved if senior management took these suggestions seriously and made appropriate changes. Staff attorneys are committed to the mission, but senior management has unfairly accused us of disloyalty when we have engaged in the following activities: Advocated for work-life balance when faced with overwhelming and unreasonable workloads; Expressed concerns about program counsel's demeaning, hostile and abusive conduct; Engaged in active debate with senior management about legal issues of reasonable dispute; Expressed honest and valid ethical concerns; Expressed honest and valid concerns about legal and factual weaknesses of cases. We are all dedicated to the mission, including those of us who voice these valid concerns and want this office to do better. The Regional Solicitor has unjustly criticized attorneys because they were hired through the Honors Program or attended prestigious law schools. The Regional Solicitor also openly speaks in a derogatory manner about certain attorneys to other attorneys, particularly after attorneys quit or transfer because of the conditions created by senior management. [...] There has been a tragic amount of turnover over the past few years. More than 15 excellent, hard-working, ethical, and committed attorneys have left the office because of the above problems and because they eventually became too beaten down and unhappy to stay. In this way, senior management has actually undermined the mission of SOL by forcing out so many talented and dedicated attorneys.[...[72]]

On May 27, 2022, S1 conducted Complainant's midyear review.[73]

---

[71] ROI at 322.

[72] ROI at 322-323.

[73] ROI at 323.

On June 2, 2022, S1 e-mailed Complainant about the joint statement in the internal survey.[74] S1 testified that he was very alarmed by the statement, specifically as it related to fear of retaliation.[75] S1 specifically asked Complainant what his talking points were when he met with staff to discuss the survey, his plan for finding a neutral third party to meet with staff, and why he would recommend an open forum when there was so much fear of retribution expressed by staff.[76]

On June 6, 2022, Complainant responded to S1's e-mail about the survey. In the e-mail Complainant states that he does not want S1 involved with resolving the concerns about retaliation in his office because S1 threatened Complainant with removal and other penalties when he "interrupted [his] planned Thanksgiving vacation to tell [him] that an investigation would be conducted."[77] S1 testified that he believed Complainant was referring to the December 3, 2021 meeting where Complainant was informed of the management investigation, and that Complainant was not on Thanksgiving vacation – or else S1 had not been informed about the vacation.[78]

On June 15, 2022, S1 e-mailed Complainant, responding that he "seeks to clarify whether and how you (and your team) responded, or intend to respond, to anonymous statements expressing fear of retaliation" and expressing that the FO was concerned about the fears of retaliation, not the truth of all the statements in the joint statement.[79] S1 also told Complainant that despite his objections, S1 would meet with staff separately from Complainant, and that he planned to do so in other regions as well, and that Complainant's response was "disrespectful to me and my authority."[80]

On August 17, 2022, the head of the Office of Public Affairs e-mailed S1 to complain that Complainant and his staff were mistreating her employees.[81] S1 testified that the Office of Public Affairs complained about the problem in the past, too.[82]

---

[74]     ROI at 324.

[75]     ROI at 324.

[76]     ROI at 324.

[77]     ROI at 324.

[78]     ROI at 324.

[79]     ROI at 325.

[80]     ROI at 327.

[81]     ROI at 327.

[82]     ROI at 327.

On August 29, 2022, S1, S2, and another Deputy Solicitor in the FO received an anonymous letter from a Philadelphia staff attorney alleging "wasteful, unethical, abusive and retaliatory conduct."[83] The letter was dated August 9, 2022.[84]

On October 12, 2022, S1 spoke with A3, a Hispanic attorney, who alleged that Complainant was retaliating against her for participating in the management investigation.[85] She said Complainant had asked her in February if she had talked to investigators and she told him that he knew she could not answer that question.[86] Complainant then told her "you let me know where you stand" and left her office, but returned a few minutes later to say he wasn't threatening her.[87] A3 said that after that interaction, Complainant cancelled a meeting with her and told someone else it was because he needed to keep his job. A3 also told S1 that she recently received an e-mail telling her that she had an inappropriate tone in a response to an instruction. A3 said the e-mail was inaccurate, and that she felt the reference to "tone" was sexist.[88] S1 asked A3 if she wanted to file a formal complaint of retaliation, and A3 said she would let him know.[89]

On October 14, 2022, the RO sent Complainant a Notice of Proposed Removal (NOPR), containing three charges: Use of GTC for Unauthorized Purposes, Failure to Make Timely Payments on GTC and Conduct Unbecoming.[90]

On October 17, 2022, S1 spoke by phone with A4, who wanted to transfer out of Complainant's region.[91] A4 said that Complainant retaliates against employees, and that she was transferring because she could not stay in Region III anymore.[92]

On October 26, 2022, A3 reached out to S1 again and told him she had a job offer. S1 spoke with her and told her that he was going to make a referral of her

---

[83]     ROI at 327, 649-51.

[84]     ROI at 649.

[85]     ROI at 328, 965.

[86]     ROI at 328.

[87]     ROI at 328.

[88]     ROI at 329.

[89]     ROI at 329.

[90]     ROI at 677.

[91]     ROI at 329.

[92]     ROI at 329.

retaliation claim to the Workplace Equality Compliance Officer (WECO).[93] S1's e-mail to the WECO included alerting the WECO of the management investigation and told the WECO that SOL would like to try to keep A3 as an employee.[94]

On November 2, 2022, S1 and S2 had a meeting with Complainant, with a representative from HR in attendance.[95] During that meeting, S1 told Complainant that the investigation into his management conduct was ongoing, and that S1 and S2 had received complaints from Complainant's staff that had been referred to the investigators. S1 then told Complainant that he "must avoid any appearance of reprisal against employees, and that reprisal could serve as an independent basis for remedial action. Reprisal does not have to be intentional, nor does it have to result in altering terms and conditions of employment, but rather can be as simple as a supervisor's words that potentially send a chilling effect on the participation in or use of the complaint process to be considered illegal."[96] S1 and S2 instructed Complainant that he must consult with S1 before taking any conduct or performance related actions and before he "interfere[d] with or express[ed] any interest in the [management] investigation."[97]

On November 7, 2022, the WECO e-mailed S1 and recommended providing interim relief to A3 because of her allegations that Complainant retaliated against her for engaging in protected activity.[98] An investigation into A3's allegations commenced (the harassing conduct investigation).

On November 10, 2022, S1 issued a Notice of Detail and No Contact Order (DNCO) to Complainant.[99]

On November 14, 2022, S1 and S2 travelled to Philadelphia to inform staff and managers that Complainant had been detailed to the FO. They prepared talking points that focused on Complainant's work on the *East Penn* litigation and avoided making any connection between Complainant's detail and the ongoing investigations. After meeting with the staff and managers, several attorneys met with S1 and S2 and expressed fears of retaliation, and complained about excessive workloads, bullying behavior, and the loss of many good attorneys in the office.[100]

---

[93]     ROI at 330.

[94]     ROI at 331.

[95]     ROI at 333.

[96]     ROI at 331.

[97]     ROI at 778.

[98]     ROI at 781.

[99]     ROI at 784-785.

[100]    ROI at 335.

On December 1, 2022, S1 met with Complainant to conduct his performance appraisal. Complainant did not turn on his camera and did not speak much. The meeting lasted four minutes.[101]

On December 7, 2022, Complainant e-mailed S1 to dispute his performance review. S1 provided Complainant with information on the procedures to seek review with the Performance Review Board.[102]

On February 10, 2023, the NOPR was rescinded. Employee relations advised the RO to rescind the NOPR in light of the more recent allegations of misconduct and because past practice was to reissue discipline notices based on all substantiated instances of misconduct.[103]

On May 25, 2023, the Director of the CRC issued a memorandum on the harassing conduct investigation.[104] The Director found that "it is reasonable to conclude that [Complainant] violated the Harassing Conduct Policy and Procedures."[105] Specifically, she stated that "it is reasonable to conclude that retaliatory harassing conduct occurred."[106]

In June 2023, another attorney alleged that Complainant harassed her.[107] After reviewing the allegation, the WECO recommended interim relief in accordance with the Agency's harassing conduct policy and commenced a harassing conduct investigation into the allegations.[108]

On June 21, 2023, due to the additional harassment complaint, the terms of the DNCO were updated to remove Complainant from the *East Penn* litigation and prohibit him from entering SOL offices without prior approval from S1.[109]

---

[101]    ROI at 336.

[102]    ROI at 336.

[103]    ROI at 292, 336.

[104]    ROI at 877.

[105]    ROI at 878.

[106]    ROI at 878.

[107]    ROI at 885-887.

[108]    ROI at 888.

[109]    ROI at 890.

In total, in a timeline that began with February 2021 and ended with June 21, 2023,[110] S1 outlined the departure or transfer of at least 14 employees from Complainant's region.[111]

## B. Administrative Investigations

The timeline above details several administrative investigations into Complainant. In total, four investigations are relevant to Complainant's complaint. Two of those investigations – the GTC investigation and the management investigation – are relevant to several of Complainant's claims and are discussed in more detail below.

### 1. Government Travel Card Investigation

The GTC is issued to employees who regularly travel for their work and is issued by Citibank.[112] Citibank's Cardholder Services Agreement outlines that employees are subject to limited credit, restrictions on the use of the card consistent with the contract between Citibank and the Government Services Administration, restrictions on the use of the card consistent with Agency policy, and that payments are due "in full, upon receipt of the statement, and payment must be received […] no later than 25 calendar days from the closing date on the statement."[113] The Cardholder Services Agreement also outlines procedures for collecting payment when a payment is not made by the due date.[114]

DOL has additional policies on use of the GTC. Relevant to this case is Department of Labor Manual Series (DLMS) 2-1600, 1-15.47, "ATM Services."[115] ATM Services permits employees to use an ATM for cash advances "for authorized travel" and allows for reimbursement for both the amount of the advance and the service charge "under certain circumstances […] provided the amounts drawn reflect reasonable cash requirements for official travel."[116] Reimbursement for cash advances is "limited to the actual amount of service fee charged on advances not

---

[110]     ROI at 313-340.

[111]     In March 2022, two attorneys left or requested to transfer out of Region III. One left in April 2022 and one more left in June 2022. 10 attorneys left the region between October 2022 and June 2023. ROI at 320, 321, 324.

[112]     ROI at 513, 1079 (Citibank Cardholder Services Agreement).

[113]     ROI at 1079.

[114]     ROI at 1080.

[115]     ROI at 1102.

[116]     ROI at 1102.

exceeding $50 times the number of days in travel status." [117] ATM Services also specifies that cash advances require that expenses actually have been incurred, audits may occur, and receipts may be requested. [118]

In addition to policies about use of the GTC, DOL and the Federal Government have policies related to government travel. Among those policies are a requirement to obtain a travel authorization and to document travel expenses. [119] Government travelers are required to "exercise the same care in incurring expenses that a prudent person would exercise if traveling on personal business." [120]

S1 testified that he first learned of the investigation into Complainant's GTC usage in February 2021 at a meeting leading up to his transfer into his current position. [121] According to S1, the Office of Inspector General began investigating Complainant's GTC use after referral by OASAM after a "routine travel card audit" that occurred during the pandemic. [122] OIG then referred the matter to SOL for further action, and SOL determined that OASAM should investigate further. [123] OASAM looked for additional information and explanation for the questionable transactions, whether e-mail or phone records contain relevant information, whether the earlier investigation looked at Complainant's authorized travel documentation, and whether underlying documents referenced in the OIG report were available. [124]

OASAM issued a Report of Supplemental Investigation (RSI) into Complainant's GTC usage. [125] The RSI found that several matters could not be resolved due to "record keeping limitations", but largely corroborated OIG's findings. [126] The initial OIG investigation found approximately $36,000 in "questionable transactions" from August 2016 to March 2020. [127] The OIG investigation divided the GTC misuse into two categories: (1) excess cash advances "taken well in advance of travel or with no apparent connection to approved travel;"

---

[117]    ROI at 1102.

[118]    ROI at 1102.

[119]    ROI at 223-224.

[120]    ROI at 511-512.

[121]    ROI at 313.

[122]    ROI at 313.

[123]    ROI at 223, 313.

[124]    ROI at 510.

[125]    ROI at 509.

[126]    ROI at 511.

[127]    ROI at 509.

and (2) GTC purchases that "appeared to be for items not authorized or that could not have been authorized."[128] The OIG report also found that the card issuer, Citibank, had to attempt to collect past due balances from Complainant in 2016 and 2019, including instituting salary offset and setting up a payment plan for Complainant to pay back $5,500.[129]

When Complainant's balance was past due in 2019, a DOL employee attempted to contact him multiple times.[130] In his interview with OIG, Complainant described the employee as "low level" and stated that it would be "inappropriate" to respond to the employee about his GTC. He stated, "I don't know what authority he had to do anything that he had to do particularly talk to my subordinate."[131] In the subsequent NOPR, Complainant's answers to the OIG investigators underlie the "Conduct Unbecoming" charge.[132]

### 2. *Management Investigation*

In November 2021, S1, in concert with S2, decided that an investigation into Complainant's management practices was necessary (the management investigation).[133] S1 testified that because OASAM was already investigating Complainant for the GTC abuse allegations, S1 and S2 decided that OASAM should also handle a separate management investigation.[134]

On December 3, 2021, S1, with a witness present, informed Complainant of the management investigation via a Teams meeting.[135] During that meeting, S1 read from prepared notes, informing Complainant of the investigation.[136] S1 told Complainant that SOL received "allegations of misconduct" by Complainant and

---

[128]     ROI at 509.

[129]     ROI at 509.

[130]     ROI at 509.

[131]     ROI at 510.

[132]     ROI at 247.

[133]     ROI at 316-317.

[134]     ROI at 317. This investigation is a separate investigation from the two harassing conduct investigations discussed in the timeline above. The management investigation and the harassing conduct investigation prompted by A3's complaints are both central to several of Complainant's claims. The harassing conduct investigation that began in June 2023 occurred after Complainant filed his complaint and shortly before the ROI was issued.

[135]     ROI at 317.

[136]     ROI at 483.

that SOL had a duty to investigate the allegations.[137] When asked, S1 told Complainant they were allegations of "harassment and mismanagement."[138] S1 told Complainant that the investigation would be conducted by OASAM, specifically the OHR Administrative Investigations Branch Chief.[139] S1 explained that Complainant's staff, as well as Complainant, would be interviewed during the investigation.[140] He also told Complainant that he "should not and must avoid any appearance of reprisal."[141] S1 also told Complainant that information about harassment complaints may only be shared on a "need to know" basis, in response to Complainant's request to see the allegations.[142]

S1 testified that several events, including his conversations with A1, the October 2021 anonymous letter, and the FEVS results and Complainant's response to them, made an investigation necessary. In August 2021, the FEVS results became available and the FO was particularly concerned about the results relating to senior leadership and fear of reprisal in Complainant's region.[143] On October 1, 2021, A1 reached out to S1 to discuss the "dismal" results of the FEVS for the region.[144] He told S1 that "we work in a toxic and dysfunctional workplace, and there is not a single non-management employee, and many in management, who would disagree."[145] A1 described Complainant as manipulative and bullying, and described him pressuring attorneys to do unethical things.[146] In the conversation, A1 described how Complainant took disagreement as a racial issue, and described Complainant as "so sexist."[147] A1 described Complainant calling female attorneys "hot" and saying other things about their appearance.[148] When S1 asked A1 what he would like S1 to do with the information he provided, A1 suggested that the FO speak to everyone in the region, including former employees.[149] Shortly thereafter, on October 9, 2021, S1 again spoke with A1, who shared that a female attorney in

---

[137]     ROI at 483.

[138]     ROI at 483.

[139]     ROI at 483.

[140]     ROI at 483.

[141]     ROI at 483.

[142]     ROI at 485.

[143]     ROI at 313.

[144]     ROI at 314.

[145]     ROI at 314.

[146]     ROI at 314.

[147]     ROI at 314.

[148]     ROI at 314.

[149]     ROI at 314.

his office recently began seeing a therapist because of how she was being treated and that she was considering leaving and her departure "would be a sad loss."[150] Shortly after that, S2 received the first anonymous complaint letter about Complainant's behavior.[151] The management investigation was commenced shortly thereafter.

## C. Performance Review, Bonus and Raise

Complainant's Executive Performance Plan for fiscal year 2022 covered the period from October 1, 2021 to September 30, 2022.[152] All regional solicitors had a common template for their performance plans for the year.[153] It contained five critical elements: Leading Change, Leading People, Business Acumen, Building Coalitions, and Results Driven.[154] For each critical element, there are five possible ratings: Outstanding, Exceeds Fully Successful, Fully Successful, Minimally Successful, and Unsatisfactory.[155] The overall rating for the period is calculated by assigning points for each critical element, weighting them according to a pre-determined contribution to the overall rating, and adding up the total to assign a final rating.[156]

Complainant received Outstanding in two critical elements: Leading Change and Results Driven.[157] Complainant received Exceeds Fully Successful in Business Acumen, Fully Successful in Building Coalitions and Minimally Successful in Leading People.[158] Overall, Complainant was rated Fully Successful for the performance period.[159] Employees who are dissatisfied with their rating may appeal their rating to the Performance Review Board, which is what Complainant did.[160] His rating was not changed.[161]

---

[150]    ROI at 315.

[151]    ROI at 472.

[152]    ROI at 212.

[153]    ROI at 353.

[154]    ROI at 212.

[155]    ROI at 213.

[156]    ROI at 212.

[157]    ROI at 212.

[158]    ROI at 212.

[159]    ROI at 212.

[160]    ROI at 149-150.

[161]    ROI at 150.

After receiving his performance rating, Complainant expressed dissatisfaction to S1.[162] In his affidavit, Complainant argued that he should have received "Outstanding" on Leading People and Building Coalitions because he leads the entire region and not just staff, his regional clients were always happy with his performance, and his office conducts more trials and recovered more than other regions.[163] Complainant also argued that the FEVS was added to his performance plan at his mid-term review.[164] Complainant argued that his rating was driven by racial animus, and alleged that at least eight lawyers in his region "openly describe the allegations or other negative actions taken against me as racially motivated."[165] Complainant did not provide names of these eight people.

S1 testified that he gave Complainant credit for his accomplishments and the Complainant should not have been rated higher.[166] He cited, as examples, Complainant's refusal to cooperate with other regions to select an expert for the OFCCP lawsuit and Complainant's handling of hiring a new Regional Deputy Solicitor as examples of Complainant's failure to perform well enough to earn higher ratings.[167] S1 also cited the numerous complaints from employees in Complainant's office and the complaint from the Office of Public Affairs.[168]

S1 testified that all Regional Solicitors were asked to put together a response to their FEVS results. He specified that employees were rated on their reactions to the FEVS, not the results of the FEVS.[169] He further testified that when the performance plans were being established, each Regional Solicitor was instructed to take the common template (which included language about developing meaningful action plans in response to FEVS results) and enter it into the fillable form for their performance plan.[170] According to S1, Complainant did not do so, and S1 had to instruct his assistant to put the language back into the plan before Complainant signed his plan when it was established.[171]

---

[162]    ROI at 336.

[163]    ROI at 146.

[164]    ROI at 146.

[165]    ROI at 145.

[166]    ROI at 350.

[167]    ROI at 350-351.

[168]    ROI at 350-351.

[169]    ROI at 353.

[170]    ROI at 353.

[171]    ROI at 353.

S1 asked each Regional Solicitor to submit their Action Plan and have a meeting to address the FEVS.[172] During the meeting about Complainant's Action Plan, S1 was concerned about Complainant's response to staff concerns about the fear of retaliation expressed by staff in the region.[173] Complainant spent a significant portion of the meeting "discounting the significance of FEVS."[174] Complainant suggested that he officiate an open forum with staff about their concerns, and S1 suggested that someone else officiate so that staff could be more open.[175] S1 offered to help arrange that.[176]

After meeting with Complainant about the plan for his region, S1 followed up with written feedback.[177] S1's feedback emphasized various items relating to employee satisfaction, including lack of support for work/life programs, Complainant's region's poor performance on relationships with "senior leadership," which included questions on items like integrity, respect, generating motivation, and trust.[178] S1 stated in his response that Complainant's region trailed "often significantly" on these items and that "these are serious comparative weaknesses."[179] S1 further stated "the Front Office was particularly disturbed by the general negative response to 'I can disclose a suspected violation of any law, rule or regulation without fear of reprisal.'"[180]

S2's testimony about Complainant's performance rating largely corroborated S1's testimony. She testified that she did not believe Complainant's response to his rating warranted a change in rating.[181] She further stated that to receive a higher rating, Complainant needed to work on his management style, treating employees fairly, and avoiding retaliation.[182] She testified that Complainant's race, sex, and prior EEO activity were "absolutely not" factors in Complainant's rating.[183] She stated that Complainant's leadership style was the subject of repeated complaints,

---

[172]     ROI at 460-461.

[173]     ROI at 316.

[174]     ROI at 316.

[175]     ROI at 316.

[176]     ROI at 316.

[177]     ROI at 480.

[178]     ROI at 480.

[179]     ROI at 480.

[180]     ROI at 480.

[181]     ROI at 952.

[182]     ROI at 953.

[183]     ROI at 953, 954.

to the point where staff "were feeling fearful and intimidated" and that given those concerns, his performance was not good enough in those areas.[184]

S2 testified that Complainant did not receive the highest possible bonus for his 2022 performance review.[185] She explained that bonuses are based on a formula, depending on performance rating.[186] S2 further testified that the Performance Review Board reviews SES performance ratings and bonuses.[187] She testified that Complainant's race, sex, and prior EEO activity had nothing to do with his bonus, which was based on his performance rating.[188] S2 also testified that many other SES employees did not receive the highest possible bonus because they did not receive the highest possible performance rating.[189] She also stated that no other SES employees supervised by S1 had the same performance issues that Complainant had.[190]

S2 provided comparator information for three other SES employees. For each of them, she provided a performance review.[191] None of the comparators received the same "Fully Successful" rating as Complainant. Two received "Outstanding" while one received "Exceeds Fully Successful."[192]

## D. Notice of Detail and No Contact Order

S1 described in detail the events that led up to the issuance of the DNCO. In August 2021, the FEVS results became available, and they showed that Complainant's region had "unimpressive" results.[193] S1 stated that the Front Office was particularly concerned with the results relating to fear of reprisal with senior leadership.[194] When the internal survey from Complainant's region was released, showing that employees had banded together to provide a common response, S1 testified that he had never encountered something similar in his career, and that

---

[184]    ROI at 953.

[185]    ROI at 957.

[186]    ROI at 957.

[187]    ROI at 958.

[188]    ROI at 958.

[189]    ROI at 960.

[190]    ROI at 960.

[191]    ROI at 1003-1035.

[192]    ROI at 1003, 1015, 1026.

[193]    ROI at 313.

[194]    ROI at 313.

his concern was that so many employees were fearful of retribution or retaliation that they felt they must answer the survey in that manner.[195]

S2 stated that the DNCO was issued because "of concerns related to his management of the Regional Office and in particular, concerns of fear and retaliation expressed by multiple staff members."[196] S2 explained that the No Contact Order "was issued at the recommendation of human resources" because of credible allegations of retaliation, harassment, and fear in the workplace.[197] A representative from HR met with Complainant's staff without Complainant in attendance and immediately thereafter, asked to meet with S1 and S2. During that meeting, the HR representative relayed that he had "never seen such a toxic or fearful environment" during his years of federal service, and he recommended that Complainant be immediately reassigned from his position in order to protect the employees and SOL.[198] S2 testified that Complainant was "placed on his detail because of the credible fears expressed by employees, not because of his race, sex, or any EEO activity."[199]

S1 issued Complainant the DNCO.[200] The DNCO informed Complainant that he was detailed, immediately, to a position of unclassified duties in the Front Office of SOL.[201] The DNCO further instructed Complainant to work remotely, request permission before entering DOL facilities, and prohibited him from contacting employees in Region III.[202] The DNCO stated that during prior meetings with S1 and S2, they had discussed the ongoing investigation by the OASAM into allegations of misconduct.[203] The meeting on November 2, 2022, informed Complainant about new allegations of misconduct, involving allegations of retaliation and retribution.[204] The DNCO informed Complainant that SOL had determined it was in their best interest to detail him pending the conclusion of

---

[195]    ROI at 324.

[196]    ROI at 283.

[197]    ROI at 285.

[198]    ROI at 285.

[199]    ROI at 943.

[200]    ROI at 260.

[201]    ROI at 260.

[202]    ROI at 260-261.

[203]    ROI at 260.

[204]    ROI at 260.

OASAM's investigation. [205] The DNCO advised Complainant that it was not a disciplinary action. [206]

S2 testified that there were new allegations of misconduct against Complainant that led to the DNCO. Specifically, A3 alleged that Complainant retaliated against her for participating in the management investigation. [207] A3 alleged that Complainant asked if she had spoken to the investigator. [208] A3 told Complainant he should not ask her that question and he told her "you let me know where you stand." [209] Later, he followed up with A3 saying he did not mean to intimidate her, which she found threatening. [210] Shortly after that, management disciplined A3, which A3 thought was in retaliation for participating in the investigation. [211]

S2 testified that the DNCO still allowed Complainant to work on one high profile case, the *East Penn* litigation. [212] Complainant continued to work on *East Penn* because the Deputy Regional Solicitor reported that Complainant had excellent relationships with the other attorneys working on that case, and Complainant was first chair of that trial. [213]

S2 testified that Complainant's responsibilities during the DNCO were to take assignments from the Front Office and continue to work on the *East Penn* litigation. [214] S2 testified Complainant never took Front Office assignments because he refused them, and claimed all his time was taken by the *East Penn* litigation. [215]

---

[205]    ROI at 260.

[206]    ROI at 261.

[207]    ROI at 942.

[208]    ROI at 328, 942.

[209]    ROI at 328, 942.

[210]    ROI at 328-329, 942.

[211]    ROI at 328-329, 942.

[212]    ROI at 942.

[213]    ROI at 942.

[214]    ROI at 940.

[215]    ROI at 940.

**E. Notice of Proposed Removal**

On October 14, 2022, the Agency issued a NOPR to Complainant.[216] The NOPR contained three charges: Use of Government Travel Card (GTC) for Unauthorized Purposes, Failure to Make Timely Payments on GTC, and Conduct Unbecoming.

1. Use of GTC for Unauthorized Purposes

This charge contained 132 specifications.[217] 95 of those specifications were instances of using the GTC to withdraw cash, in violation of DLMS 2-1600, General Travel Regulations.[218] 37 of the specifications were for using the GTC for unauthorized expenses in violation of DLMS 2-1600, General Travel Regulations.[219] These cash advances were often taken in the amounts of $400 or $500, over multiple transactions.[220] They totaled thousands of dollars. The remaining specifications were for gas or other smaller purchases. Each specification in Charge 1 detailed when Complainant's next authorized travel date was. Many of the dates were not in close proximity to the cash advance, and the withdrawals exceeded the $50 per day policy. The NOPR noted that because Complainant did not put the cash advance fees on his reimbursements, the practice did not come to management's attention.[221]

2. Failure to Make Timely Payments on GTC

This charge contained 50 specifications for violating the Government Travel Regulations, DLMS 2-1600, 1-15.43(2) and 1-15.44 and the GTC cardholder agreement.[222]

3. Conduct Unbecoming

---

[216]    ROI at 222.

[217]    ROI at 224-238.

[218]    ROI at 223.

[219]    ROI at 224.

[220]    ROI at 224-235.

[221]    ROI at 249.

[222]    ROI at 238.

This charge contained two specifications for interviews with the OIG wherein Complainant was "combative and less than fully cooperative" and those responses detracted from his "character and/or reputation as a Supervisor." [223]

In recommending the punishment of removal, the RO found that Complainant's misconduct was repeated over an extensive period of time and that his position as an SES required a higher standard of conduct than other federal employees. [224] The RO also found that Complainant attempted to obfuscate the misconduct when questioned by OIG. [225] The RO noted that the OIG referred Complainant's misconduct to the U.S. Attorney's Office. [226]

On February 10, 2023, the NOPR was rescinded. [227] The e-mail advising Complainant of the recission stated that it "does not preclude the Department from taking action based on the misconduct detailed in the Notice and/or other misconduct." [228] On the same day, S1 advised Complainant that he was to remain in his detail and that the DNCO remained in full effect. [229]

### 1. *Complainant's Response*

Complainant submitted a written response, through his attorney, to the NOPR. In it, he disputed all charges, and additionally stated that the NOPR was discriminatory and retaliatory. [230] The Complainant also alleged that the OIG investigation was retaliatory. [231] The substance of Complainant's response emphasized that there was no loss to the government from Complainant's actions and that Complainant made full repayment. Complainant argued that he did not fail to pay his card on time and that his card was never cancelled. [232] He also claimed that he did not violate agency policies. [233]

---

[223]     ROI at 247.

[224]     ROI at 249.

[225]     ROI at 251.

[226]     ROI at 252-253.

[227]     ROI at 292-93.

[228]     ROI at 293.

[229]     ROI at 294.

[230]     ROI at 265.

[231]     ROI at 265.

[232]     ROI at 272.

[233]     ROI at 265.

Complainant argued that he complied with Agency policies that required him to get advanced authorization for his travel. [234] He also stated that the limit on his GTC was increased from $5,000 to $9,000, which showed that the Agency "knew of and approved of his travel expenses." [235]

In disputing the first charge, Complainant argued that some places he traveled to did not have ample ATM access and that he preferred to pay for things like cab fares with cash. [236] He argued that Agency policy permitted cash withdrawals, that the $50 per day cap the NOPR cites was not absolute, and that he was only reimbursed for authorized expenses. [237] He also argued that the Agency knew about his cash ATM withdrawals for years and should not now ask him to justify his withdrawals after the fact. [238] He further stated that the NOPR did not take into account travel that was cancelled, particularly travel during the COVID-19 pandemic that was cancelled late because the federal judges overseeing the relevant hearings were late providing notice. [239]

His response to the NOPR also contested the proposed penalty and raised the affirmative defense of discrimination. In addition to his complaints of race discrimination, which are outlined in more detail below, he alleges that the OIG investigation was retaliatory. [240]

## F. Complainant's Complaints of Discrimination

In his complaint, response to the NOPR, and throughout his affidavit, Complainant states that he engaged in protected activity by highlighting race discrimination at DOL. Specifically, he has alleged that the Agency fails to hire Black attorneys, fails to support and promote Black attorneys, and that the Honors Attorney Program disproportionately recruits Caucasian attorneys. [241] He further alleges that White attorneys are praised for skills like trial advocacy and leadership, while Black attorneys are criticized for the same. [242] He states his

---

[234]     ROI at 267.

[235]     ROI at 268.

[236]     ROI at 268.

[237]     ROI at 267, 269.

[238]     ROI at 269.

[239]     ROI at 270.

[240]     ROI at 289.

[241]     ROI at 283.

[242]     ROI at 283.

physical appearance, as a tall Black man, has been repeatedly labeled as aggressive, confrontational, angry and overbearing. [243]

Complainant argued in his response to the NOPR that the OIG investigation itself was retaliatory. He stated that in May 2020, during the prior administration, the former Secretary of Labor, Eugene Scalia, pushed Complainant to settle a case alleging racism by a federal contractor. [244] Complainant stated that the internal evaluation found $50 million in damages and the former Secretary wanted to settle for $3 million. [245] According to Complainant, the former Secretary and S1 were aware of Complainant's objections to the settlement at the time. Immediately thereafter, in July 2020, he alleges the OIG investigation was initiated. [246]

Complainant raised his complaints about race discrimination to S1 on multiple occasions. He also raised his complaints to S2. According to Complainant, his protected activity includes:

1. August 2021 complaints to S2 about the lack of diversity at DOL, and requests to S2 and S1 for data about the same.
2. September 2021 complaints to S1 and S2 about discrimination against Black attorneys and/or managers at DOL.
3. March 2022 complaints to S2 and S1 that DOL was refusing to assign honors attorneys to work in his region because Complainant is Black.
4. May 2022 complaint to S1 about discrimination against a Black attorney, A5.
5. June 6, 2022 complaint to S1 about racism in the Honors Program (overseen by S1).
6. Late August/early September 2022: Public complaint to S2 and S1 about diversity on a Microsoft Teams call. [247]

Complainant alleges the following additional protected activity, but does not specify dates or times:

1. Complaints that DOL fails to hire Black attorneys, fails to promote them to managerial positions, and also fails to support them in their employment, ultimately resulting in ending or damaging their careers with DOL.
2. Complaints about DOL's practice of subjecting Black attorneys to investigations based on specious allegations of misconduct.

---

[243]     ROI at 283.

[244]     ROI at 289.

[245]     ROI at 290.

[246]     ROI at 290, 223.

[247]     ROI at 4.

3. Complaints that DOL's Honors Attorney Program disproportionately recruits Caucasian attorneys, and provides them with professional advancement opportunities not available to Black attorneys in DOL.

4. Complaints that DOL repeatedly holds himself and other Black attorneys to different standards than Caucasian attorneys: while DOL awards Caucasian attorneys for showing skills like trial advocacy, leadership, and obtaining victories for DOL, DOL penalizes Black attorneys for the same traits, labeling them with negative stereotypes such as aggressive, confrontational, angry, and overbearing.[248]

Complainant also wrote a letter to Secretary Marty Walsh on November 16, 2022, shortly after the NOPR was issued. In his letter, Complainant alleged that his protected activity, particularly his requests for data and complaints about lack of Black attorneys and Black managers at SOL, led DOL to issue the NOPR.[249]

S2 testified that when she first met Complainant, he expressed concerns about lack of diversity in SOL.[250] S2 also testified that she took Complainant's concerns about how he was treated by his colleagues and concerns about diversity in SOL seriously.[251] In her affidavit, she explains that she made sure to celebrate Complainant's victories in court within SOL, and that she took his concerns about programs like the Honors Attorney Program seriously.[252]

## IV. Legal Analysis

In his complaint of discrimination, Complainant has alleged that SOL subjected him to unlawful disparate treatment and a hostile work environment based on his race, sex and/or in reprisal for prior EEO activity when:

1. *On November 10, 2022, DOL issued Complainant a "Notice of Detail and No Contact Order" removing Complainant from his duties as Regional Solicitor and detailing Complainant to "to a position of unclassified duties with the SOL Front Office, effective immediately."*

2. *On December 1, 2022, DOL gave Complainant a negative performance review.*

3. *In December 2022, DOL denied Complainant a full bonus and raise.*

---

[248] ROI at 5.

[249] ROI at 1040. The letter also requested a litigation hold.

[250] ROI at 962.

[251] ROI at 962.

[252] ROI at 964-65.

4. *In or around December 2022, DOL proposed Complainant's removal from federal service.*
5. *DOL has subjected Complainant to an ongoing pattern of discriminatory disparate treatment, including:*
   a. *Stereotyped criticism, increased scrutiny, and repeatedly holding Complainant to different standards than Caucasian attorneys: while DOL awards Caucasian attorneys for showing skills like trial advocacy, leadership, and obtaining victories for DOL, DOL penalizes Complainant and Black attorneys for the same traits, labeling them with negative stereotypes such as aggressive, confrontational, angry, and overbearing.*
   b. *Stereotyped criticism, increased scrutiny, and repeatedly holding Complainant to different standards than Caucasian managers when Complainant acts in his managerial capacity, including assessing performance, making decisions about cases, work assignments, discipline, and promotions.*
   c. *Biased, discriminatory assumptions that when there are workplace disputes, Caucasian employees are believed, and the Black employees, including Complainant, are lacking credibility, at fault, and/or have engaged in misconduct.*
   d. *Subjecting Complainant to administrative investigations (conducted by DOL's OASAM/OHR/DELMR) regarding discriminatory allegations made by Caucasian staff, including in November 2022 and January 2023.* [253]

Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, makes it an unlawful employment practice to engage in discrimination based on race and sex, among other bases. Title VII also makes it unlawful to retaliate against an employee for filing a charge of discrimination; participating in a proceeding regarding discrimination; or otherwise opposing discrimination made unlawful by civil rights statutes. [254] EEO regulations at 29 C.F.R. § 1614 also prohibit retaliation for engaging in EEO activity.

## A. Unlawful Disparate Treatment

### 1. *Prima Facie Case*

In the absence of direct evidence of unlawful discrimination, the traditional analytical framework for evaluating the merits of Complainant's allegations of

---

[253]   ROI at 48-49.

[254]   *Nelson v. Dep't of the Army*, E.E.O.C. Appeal No. 0120090598, 2011 WL 3647305, at *5 (Aug. 10, 2011).

disparate treatment, which I employ here, is based on *McDonnell Douglas Corp. v. Green.* [255] Under that approach, a complainant must first establish a *prima facie* case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination; *i.e.*, that a prohibited consideration was a factor in the adverse employment action. [256]

To establish a *prima facie* claim of disparate treatment discrimination, Complainant must show: (1) that he is a member of one or more protected groups (e.g., race); (2) that he was treated less favorably than other similarly situated employees who are not members of his protected groups; and (3) that a nexus exists between the disparate treatment and Complainant's protected characteristics. [257]

To establish a *prima facie* case of reprisal discrimination, Complainant must show that: (1) he previously engaged in protected activity or opposed unlawful discrimination as identified in 29 C.F.R. § 1614.101(b); (2) the agency was aware of the protected activity; (3) he was subsequently subjected to an adverse employment action by the agency which is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination; and (4) a nexus exists between the protected activity and the adverse treatment at issue in this complaint. [258]

Under Title VII, once a complainant has established a *prima facie* case, the agency must articulate a legitimate, non-discriminatory reason for its actions. [259] If the agency is successful, then the complainant must prove by a preponderance of the evidence that the legitimate reason proffered by the agency was a pretext for discrimination. [260]

This established analysis in discrimination cases, in which the first step normally consists of determining the existence of a *prima facie* case, need not be followed in all cases. [261] Where the agency has articulated a legitimate, non-

---

[255]   411 U.S. 792 (1973).

[256]   *Id.* at 802.

[257]   *Irby v. U.S. Postal Serv.*, E.E.O.C. Appeal No. 01991479, 2001 WL 1103840, at *2 (Sep. 14, 2001).

[258]   *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Clay v. Dep't of Treasury*, E.E.O.C. Appeal No. 01A35231, 2005 WL 229766, at *4-5 (Jan. 25, 2005); *Talley v. Dep't of Treasury*, E.E.O.C. Appeal No. 01A3500, 2004 WL 1719232, at * 7 (July 20, 2004).

[259]   *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[260]   *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256.

[261]   *Lukacs v. Dep't of Health and Human Servs.*, E.E.O.C. Appeal Nos. 01A42055, 01A42142, 01A42145, 01A42227, 2005 WL 1073706, *2 (Apr. 27, 2005).

discriminatory reason for the personnel action at issue, the factual inquiry can proceed directly to the third step of the *McDonnell Douglas* analysis, the ultimate issue of whether Complainant has shown by a preponderance of the evidence that the agency's actions were motivated by discrimination.[262]

Strictly for the purposes of this analysis, and in the interest of brevity, we assume without deciding that Complainant has made a *prima facie* case of discrimination based on race, sex, and reprisal. As a result, the evidentiary burden shifts to the Agency to articulate legitimate, non-discriminatory, non-retaliatory reasons for its actions regarding these claims.

### 2. *Agency's Legitimate, Non-discriminatory, Non-retaliatory Explanations*

The Supreme Court has made it clear that when management articulates legitimate, non-discriminatory reasons for its actions, it is not required to prove that it was actually motivated by the proffered reasons.[263] Instead, all that is required is that management articulate some reason for its action that does not implicate any protected bases.[264]

> 1. <u>Claim 1</u>: *On November 10, 2022, DOL issued Complainant a "Notice of Detail and No Contact Order" removing Complainant from his duties as Regional Solicitor and detailing Complainant to "to a position of unclassified duties with the SOL Front Office, effective immediately."*

Here, the Agency's reasons for the DNCO are set out in S1 and S2's affidavits. S1 details at length that SOL received repeated complaints about Complainant's management practices. S1 also detailed poor results in questions related to reprisal in the FEVS for Complainant's region. S1 also describes learning about a complaint of retaliation from A3, who credibly stated she was retaliated against. S2 described in her affidavit a desire to protect SOL and agency employees in deciding to issue the DNCO. E-mails, FEVS results, and notes from conversations confirm the details of both S1's and S2's testimonies.

S2 testified she did not recall Complainant saying he was subject to disparate treatment because of his race, sex or prior EEO activity until he was placed on detail.[265] She further explained that the detail was the best option given the

---

[262]  *Id.* (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713-14 (1983)).

[263]  *Burdine*, 450 U.S. at 254-55.

[264]  *Id.*

[265]  ROI at 962.

numerous complaints about his management style, including allegations that he threatened a Hispanic attorney, A3, and disciplined her for participating in the management investigation.[266] She also testified that Complainant complained that other Regional Solicitors did not give him the respect he deserved, but that he did not raise concerns about how he was treated by his superiors until he was placed on detail in November 2022.[267]

The Agency has a need to protect its employees from harassment. It is required by law to keep the workplace free from harassment and retaliation. Complainant was instructed when the management investigation began to avoid any appearance of retaliation. He received repeated instructions to avoid retaliation or the appearance of it. The record evidence shows that he ignored the instructions and instead behaved in a way that a staff attorney thought was threatening.[268] The Agency's duty to protect its employees is well-established,[269] and thus, I find that it has met its burden to show that its actions were legitimate, non-discriminatory, and non-retaliatory.

  2. <u>Claim 2</u>: *On December 1, 2022, DOL gave Complainant a negative performance review.*

S1 explained in his affidavit how Complainant's performance was rated for the relevant time period. Importantly, while Complainant alleges he was given a negative performance review, he in fact received a rating of "Fully Successful." Where Complainant was less than "Fully Successful" on his performance review was in one category, Leading People, where he received "minimally successful." As to that category, S1 provided ample evidence supporting that rating. He articulated genuine concerns about Complainant's ability to perform this aspect of his job, citing, among other things, poor rating in the FEVS, allegations of retaliation by Complainant's staff and other behaviors that are generally frowned upon, or are an outright liability, in a manager. S2 noted that "fear of retaliation" is "something that we are always concerned about in our external work in enforcing our labor and employment laws."[270] The record corroborates S1 and S2's testimony. There are

---

[266]   ROI at 962-963.

[267]   ROI at 963.

[268]   ROI at 328.

[269]   "Federal Agencies are legally obligated to establish and maintain effective anti-harassment programs." *Rosamaria F. v. Dep't of the Navy*, EEOC Appeal No. 0120181068, 2020 WL 949668, at *7 (Feb. 14, 2020). "An agency must take reasonable care to protect its employees from discriminatory harassment." *Caroline B. v. Dep't of Veterans Affs.*, EEOC No. 2020000978, 2021 WL 4477098, at *8 (Sept. 16, 2021).

[270]   ROI at 951.

several complaints from staff about Complainant's treatment and results of the FEVS show that Complainant's region performed poorly on areas of leadership.

S1 also rated Complainant less than "Outstanding" in Building Coalitions and cited a specific example of Complainant's failure to cooperate in selecting the expert for the OFCCP lawsuit. A review of the record corroborates S1's testimony on this as well. E-mails in the record show Complainant essentially insulting his colleagues when they disagreed with him about which expert to select.

It is certainly the Agency's prerogative to expect employees in management positions such as Complainant's to treat employees with respect, follow agency policy and the law prohibiting retaliation and harassment, and follow best practices for managing employees. I find that the Agency provided ample support of its ratings of Complainant's performance, and thus, met its burden to articulate legitimate, non-discriminatory, non-retaliatory reasons for its actions.

3. <u>Claim 3</u>: *In December 2022, DOL denied Complainant a full bonus and raise.*

Here again the Agency articulates legitimate, non-discriminatory, non-retaliatory reasons for its actions. S1 explained that bonuses are allocated based on budget and performance rating. S2 corroborated this testimony, stating that to receive the highest bonus, an SES employee must receive a perfect scoring on their performance appraisal. Bonuses are calculated on a formula based on the performance rating, and are not left to discretion. Complainant, having received a "Fully Successful" rating, received a bonus commensurate with that rating. As to his salary, again, S1 explained that Complainant received an appropriate increase commensurate with his performance rating. There is no evidence in the record that Complainant was denied a bonus or a raise. Complainant, instead, is alleging that his prior ratings – Outstanding – should be granted to him again, and his bonus should reflect that. However, as discussed above in Claim 2, the Agency provided legitimate, non-discriminatory reasons for his performance rating. As that rating is the basis for his bonus and raise, I find that the Agency met its burden to articulate legitimate, non-discriminatory, non-retaliatory reasons for its actions.

4. <u>Claim 4</u>: *In or around December 2022, DOL proposed Complainant's removal from federal service.*

The NOPR was issued for Complainant's failure to adhere to Agency policy for the use of the GTC, including taking thousands of dollars of cash advances. The three charges it contained all related to the issue – Complainant's use of his GTC that was not consistent with Agency travel policy, the Cardholder Agreement, and the Federal Travel Regulations. The NOPR further faulted Complainant for his combative interview and evasive responses when he was interviewed by OIG about

his travel expenses. The RO recommended removal in the NOPR, citing Complainant's senior position of trust within the Agency and the extended period of misconduct. Requiring employees to abide by policy when they travel and be prudent users of government resources is a well-established prerogative of the Agency. Complainant's conduct with his GTC was so unusual as to not only prompt an OIG investigation, but also a referral to the U.S. Attorney's office.[271] While charges were not pressed against Complainant, the referral in and of itself offers evidence of the seriousness of Complainant's misuse of his GTC. The Agency is obligated to manage its resources well, and that includes holding employees accountable when they demonstrate disregard for policies designed to protect against waste and ensure accountability. Accordingly, I find that the Agency met its burden to articulate legitimate, non-discriminatory, non-retaliatory reasons for its actions.

5. <u>Claim 5</u>: *DOL has subjected Complainant to an ongoing pattern of discriminatory disparate treatment including:*
   a. *Stereotyped criticism, increased scrutiny, and repeatedly holding Complainant to different standards than Caucasian attorneys: while DOL awards Caucasian attorneys for showing skills like trial advocacy, leadership, and obtaining victories for DOL, DOL penalizes Complainant and Black attorneys for the same traits, labeling them with negative stereotypes such as aggressive, confrontational, angry, and overbearing.*
   b. *Stereotyped criticism, increased scrutiny, and repeatedly holding Complainant to different standards than Caucasian managers when Complainant acts in his managerial capacity, including assessing performance, making decisions about cases, work assignments, discipline and promotions.*
   c. *Biased, discriminatory assumptions that when there are workplace disputes, Caucasian employees are believed, and the Black employees, including Complainant, are lacking credibility, at fault, and/or have engaged in misconduct.*
   d. *Subjecting Complainant to administrative investigations (conducted by DOL's OASAM/OHR/DELMR) regarding discriminatory allegations made by Caucasian staff, including in November 2022 and January 2023.*[272]

Several of the events Complainant outlines in this claim are untimely and occurred prior to the 45-day deadline for making EEO contact. The untimely events are discussed below, in the hostile work environment claim, where appropriate. For example, Complainant alleges that the GTC investigation was itself retaliatory, but

---

[271]    ROI at 252-253.

[272]    ROI at 48-49.

the events he said led to the retaliation happened in 2020, and the investigation by OIG happened in 2020. Complainant made EEO contact in late 2021, well past the 45-day deadline for those events.

As to the events in this allegation that are timely, Complainant alleges, repeatedly, in his affidavit and in e-mails and meetings with his colleagues and supervisors that management within SOL is racially biased and treat him negatively because of his race. To support his argument, he cites the Honors Attorney program, which he complained about to S1 and S2, as an example of how the agency discriminates against Black employees. He also cites his status as one of the few Black managers and Black attorneys within SOL. He also says his management is subject to increased scrutiny because of his race.

S1 and S2, however, cite specific events and provide specific evidence to support their responses and management of Complainant. As one example, Complainant alleges that SOL refused to release diversity statistics and that S2 was angry when he asked about the statistics in a meeting with other people. S2, on the other hand, states that she took diversity seriously, but needed to work with attorneys within SOL to protect privacy before she released information publicly. S2 eventually released the information. [273]

Complainant alleges that he was labeled as angry and confrontational because of his race, gender, and protected activity. S1 testified, and the record corroborates, that often Complainant failed to work well with others or take direction. Complainant, for example, was rude to employees in Public Affairs and his behavior prompted complaints to S1. [274] He argued with S1 about whether or not Complainant's management authority was being respected by S1 when S1 instructed him, due to budget considerations, to work with his colleagues to select an expert for the OFCCP lawsuit. The record is replete with evidence of members of Complainant's staff approaching S1 with complaints about Complainant. These employees stated they were afraid of Complainant, that he bullied them, that he penalized employees who disagreed with them, and that he engaged in poor management and ethical lapses.

S1 and S2 both testified that they initiated the management investigation because of the complaints from employees, and the record confirms that employees complained about Complainant's conduct regularly, via several different avenues. S2 stated that one of the reasons that OASAM was selected to investigate Complainant's leadership practices was because of his allegations that his staff's

---

[273]     ROI at 964.

[274]     ROI at 327.

responses were racially biased. [275] She further testified that the investigation began in Fall 2021, and that action was only taken against Complainant when "the level of fear and retaliation proved too extreme" and there was a credible allegation of harassment and retaliation by a woman of color that Complainant supervised. [276]

Accordingly, I find that management articulated legitimate, non-discriminatory, non-retaliatory reasons for its actions.

### 3. *Pretext*

Management has articulated legitimate, non-discriminatory, non-retaliatory reasons for its actions concerning Complainant. Thus, the burden shifts to Complainant to prove that management's articulated reasons are not the true reasons for the employment decision, but rather that management's asserted rationale is a pretext for discrimination. [277] Complainant can satisfy this burden either "directly by persuading the [factfinder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." [278] The Commission has held that mere allegations are insufficient to show pretext for discrimination. [279]

All evidence is evaluated in the pretext analysis to determine whether Complainant has produced sufficient evidence to show management's stated reasons for its action are untrue. [280] It is well-settled that the Commission has adopted this analysis, holding that the burden of persuading the Commission that an agency's actions constitute unlawful discrimination rests at all times with Complainant. [281]

1. Claim 1: *On November 10, 2022, DOL issued Complainant a "Notice of Detail and No Contact Order" removing Complainant from his duties as Regional Solicitor and detailing Complainant to*

---

[275]     ROI at 965.

[276]     ROI at 967.

[277]     *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804.

[278]     *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at 804-05).

[279]     *Belia B. v. U.S. Postal Serv.*, E.E.O.C. No. 2019003523, 2020 WL 5994602, at *5 (Sept. 9, 2020).

[280]     *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Aikens*, 460 U.S. at 714-15.

[281]     *See, e.g., Conley v. Dep't of Navy*, E.E.O.C. Appeal No. 01991702, 2001 WL 1478978, at *5 (Nov. 8, 2001); *Raju v. Dep't of Veterans Affairs*, E.E.O.C. Appeal No. 01986574, 2001 WL 1386629, at *8 (Nov. 2, 2001).

> "to a position of unclassified duties with the SOL Front Office,
> effective immediately."

Complainant alleges that during the detail he "essentially was demoted to a staff attorney," and required to sign in and out, among other restrictions. [282] He alleges he was not given a reason for the DNCO. [283] He called the allegations "classic examples of racist stereotypical troupes [sic]" and that no concrete actions have been alleged, "all of it based on the sensitivities of my white employees." [284]

Complainant alleges several other senior SOL employees, all of them white, have had several EEO complaints filed against them, also have low FEVS results and have serious attrition and morale problems. [285] He says that none of those white managers have been subject to a DNCO. [286] In his affidavit, Complainant alleges that two comparators were treated differently than he, C1 and C2. In her affidavit, S2 disputed that. S2 specifically said she was unaware of any misconduct by C2, and that C1 had left the department before S2 began her job. [287] She stated that both comparators were white females, and that S2 was unaware of any misconduct that would warrant placing either on a DNCO. [288] She further testified that she was unaware of any other SES employee within SOL engaging in alleged misconduct that would warrant placing them on a DNCO. [289]

Complainant states that "no one has alleged that I took any action, unlawful or otherwise, against any employee based on their protected status." [290] He also states that "no one has alleged" that he created a hostile work environment, sexually harassed anyone or retaliated against anyone based on "legally recognized protected activity." [291] He alleges that "the anonymous complaint investigation, subsequent allegations and investigations are rife with unlawful animus and retaliatory acts." [292] He states the initial investigation took 18 months, attempted to pursue witnesses from 5 years ago, included old allegations and "contained no

---

[282]    ROI at 121.

[283]    ROI at 122.

[284]    ROI at 123.

[285]    ROI at 123.

[286]    ROI at 123.

[287]    ROI at 944.

[288]    ROI at 944.

[289]    ROI at 945.

[290]    ROI at 123.

[291]    ROI at 123.

[292]    ROI at 124.

actual allegations of any specific act related to an actual action based on an employee's protected class or protected activity." [293] He further alleges that most allegations were subjects of prior complaints, and were resolved in the past and that the only difference is that now S1, S2, and another Deputy Solicitor in the FO are in their roles. [294] He also states that "it appears that the action was taken because two white females alleged that I retaliated against them" and that the DNCO "was based on the most pernicious stereotypes of Black males." [295] He states that he has a 36-year record of exemplary performance and no prior disciplinary actions. [296] He also notes that the DNCO separated him from his white staff, but still allowed him to work with a Black woman on a daily basis. [297] He further states that all the Black managers in his region are under investigation for similar conduct, but none of the white managers. [298]

Complainant fails to show that the Agency's reasons were pretext for discrimination. His response fails to address substantively the reasons for the DNCO and instead alleges a variety of motives for the DNCO without providing evidence in support of them.

As discussed above, repeated allegations of retaliation and mismanagement were made against Complainant. When A3 contacted S1 with specific, detailed allegations of retaliation, S1 contacted the agency WECO, in accordance with the Agency's harassment policy. The WECO advised that A3 should be provided interim relief. An investigation into A3's complaint was commenced.

Simultaneously, an HR representative traveled to Complainant's region to speak with the staff. That meeting so alarmed the HR representative that he requested to immediately speak with S1 and S2, and told them he had never experienced such a culture of fear in his career. [299] The DNCO was issued thereafter to protect employees and the Agency from serious allegations of Complainant's misconduct.

Complainant alleges that the investigation and other allegations are a result of racism but fails to offer evidence that the Agency's conduct was anything but driven by a desire to follow the law and protect itself from liability and its

---

[293]     ROI at 124.

[294]     ROI at 124.

[295]     ROI at 124.

[296]     ROI at 124.

[297]     ROI at 124.

[298]     ROI at 124.

[299]     ROI at 962-963.

employees from harassment. Complainant instead alleges that new management led to a rehashing of old complaints, that leadership was "unwilling" to recognize Complainant's success, that the DNCO is full of "racist tropes" and that Black attorneys in his region complained about racism they experienced from white attorneys. [300] His affidavit, though, fails to offer evidence in support of these claims. Some of Complainant's allegations are directly refuted by the record. For example, while Complainant alleges that the DNCO is a result of old complaints, it was in fact prompted by new complaints of retaliation.

The clear weight of the evidence shows that the Agency issued the DNCO out of concern that Complainant's behavior, specifically as it related to retaliatory conduct, had become a liability and to protect Complainant's staff. This was after Complainant was warned, repeatedly, not to retaliate against his employees. Complainant has offered nothing but mere allegations to undermine those reasons. Accordingly, I find Complainant has failed to show that the Agency's reasons are pretext for discrimination for this claim.

2. <u>Claim 2</u>: *On December 1, 2022, DOL gave Complainant a negative performance review.*

Complainant claims that he was unfairly marked down for his performance, and that he "led the entire region, not just his staff," delivered impressive litigation results and his regional clients provide positive feedback on his work. [301] He also claims that the FEVS portion of his performance plan was added at his mid-year review. Complainant further alleges that he was rated lower than other comparable employees. Complainant's arguments fail to carry his burden to show the agency's reasons for its actions were pretext.

While Complainant argues with the way he was rated, he fails to provide evidence that his performance in the area of "Leading People" was adequate. He alleges that 10 or 11 staff attorneys formed a "resistance" that was racially motivated, but does not provide evidence that this resistance actually existed or was race based. To the extent the record shows there were attorneys in his office who made complaints, the complaints were based on Complainant's treatment of them, contained no mention of Complainant's race, sex or EEO conduct, and often included specific examples of Complainant's treatment.

Complainant further fails to provide evidence that his performance in the area of "Building Coalitions" warranted a higher rating. The uncontroverted record evidence shows that Complainant failed to treat his colleagues with respect, even when repeatedly directed to work with them.

---

[300]     ROI at 125.

[301]     ROI at 147.

Complainant also fails to offer other evidence to undermine the Agency's legitimate, non-discriminatory reasons for his rating. While Complainant states that he is treated worse than other managers, S2 testified that no other RSOLs had Complainant's performance problems or faced his allegations of retaliation. S1 testified similarly. Complainant says other RSOLs received better ratings than he but had similar numbers of complaints, however, this assertion is contradicted by the testimony of S1 and S2.

Complainant's assertion that the FEVS results were added to his performance review mid-year is contradicted by S1 and S2's testimony and the record evidence, which shows that all RSOLs were asked to develop and implement Action Plans in response to FEVS results. Complainant focuses on how the FEVS results related to senior leadership are wrong because the sample was too small or the term senior leadership was ill-defined, but S1 testified that the numbers themselves were not what prompted concern. S1 was instead troubled by Complainant's response to concerns about retaliation in the office and Complainant's repeated refusal to engage with the issue, despite multiple meetings, e-mails, and work assignments. Complainant argues that S1 ignored the opinions of his regional clients, which showed positive reviews of Complainant, but Complainant's job requires more than keeping regional clients happy. His performance review nonetheless acknowledges his success in this area.

While Complainant alleges that his protected classes led to his lower performance rating, a review of the performance reviews of three other SES employees, C3, C4 and C5, refutes Complainant's allegations. S2 testified that the other employees did not have Complainant's performance or misconduct problems. [302] Complainant has offered no evidence to refute S1 and S2's testimony other than his assertions.

Complainant repeatedly alleges bias but fails to provide evidence of bias to support his allegations. Here again the clear weight of the evidence shows that the Agency assessed Complainant's performance based on its legitimate reasons related to management. Complainant has failed to meet his burden to show that the Agency's legitimate, non-discriminatory, non-retaliatory reasons are pretext for discrimination for this claim.

    3. <u>Claim 3</u>: *In December 2022, DOL denied Complainant a full bonus and raise.*

Complainant also fails to show how the Agency's explanations for his bonus and raise were pretext for discrimination. As discussed above, the Agency provided ample support for its ratings of Complainant, and Complainant's attempt to show

---

[302]    ROI at 960.

that the Agency's reasons are pretext failed. As Complainant's bonus and raise are based on his performance evaluation, and allocated by a formula, there is no evidence he can provide to undermine the Agency's legitimate reasons, unless he can show a deviation from that formula, which he does not allege, or that the rating itself was biased. As discussed above, he has failed to show the rating itself was biased. He argues, instead, that he is owed the maximum bonus and raise. However, as discussed above, the Agency provided legitimate reasons for its performance rating that Complainant fails to undermine. Accordingly, Complainant has failed to meet his burden to show that the Agency's legitimate, non-discriminatory, non-retaliatory reasons are pretext for discrimination for this claim.

4. <u>Claim 4</u>: *In or around December 2022, DOL proposed Complainant's removal from federal service.*

Complainant's response to the NOPR and his affidavit fail to provide evidence that the Agency's reasons for the NOPR were pretext for discrimination. While Complainant's response to the NOPR focuses on the OIG report's finding that there was no loss to the government because of his actions, he fails to show that the Agency had ulterior motives or was otherwise not genuinely alarmed by his failure to abide by the reasonably prudent person standard laid out by the travel rules, and by the specific limitations on the use of cash advances.

The RO in the NOPR discussed at length Complainant's position of authority in the Agency, Complainant's public facing role, and the steps Complainant took to avoid review of his GTC practices. While the NOPR was eventually rescinded (because of a new misconduct investigation), Complainant alleges that the OASAM investigation into his GTC usage was a result of retaliation for his complaints of discrimination.[303] He states that the OIG investigation was closed, and that the new leadership in SOL revived the allegations.[304] He also argues that the conduct at issue resulted in full repayment to the government.[305]

Complainant's allegations are contradicted by the record. S1 testified that the OIG investigation was closed, but that OIG referred it to SOL with instructions to report to OIG on any discipline.[306] When SOL received it, they found gaps, which the RSI attempted to fill. Both S1 and S2 were not employed in their positions when the GTC investigation began. S1 and S2 were also separated from the decision-making process for discipline because they wanted an independent recommending

---

[303]     ROI at 118.

[304]     ROI at 118.

[305]     ROI at 118.

[306]     ROI at 313.

official. [307] Complainant's contradicted or unsupported assertions are insufficient to meet his burden. Accordingly, he has failed to show that management's legitimate, non-discriminatory reasons were pretext for discrimination.

5. <u>Claim 5</u>: *DOL has subjected Complainant to an ongoing pattern of discriminatory disparate treatment, including:*
   a. *Stereotyped criticism, increased scrutiny, and repeatedly holding you to different standards than Caucasian attorneys: while DOL awards Caucasian attorneys for showing skills like trial advocacy, leadership, and obtaining victories for DOL, DOL penalizes Complainant and Black attorneys for the same traits, labeling them with negative stereotypes such as aggressive, confrontational, angry, and overbearing.*
   b. *Stereotyped criticism, increased scrutiny, and repeatedly holding you to different standards than Caucasian managers when Complainant acts in his managerial capacity, including assessing performance, making decisions about cases, work assignments, discipline and promotions.*
   c. *Biased, discriminatory assumptions that when there are workplace disputes, Caucasian employees are believed, and the Black employees, including Complainant, are lacking credibility, at fault, and/or have engaged in misconduct.*
   d. *Subjecting Complainant to administrative investigations (conducted by DOL's OASAM/OHR/DELMR) regarding discriminatory allegations made by Caucasian staff, including in November 2022 and January 2023. [308]*

Complainant claims, repeatedly, that the actions management took against him are based on his race, sex, and his repeated complaints about the lack of diversity in SOL. The record shows several instances where Complainant alleges that stereotypes or racism are why he is being subject to scrutiny or asked to do something. A thorough review of the record, shows, however, that Complainant was often rude, combative, or uncooperative. For example, in the e-mail discussion about which expert to choose for the OFCCP lawsuit, Complainant makes comments about his litigation style and implies that the other RSOLs are worse litigators than he is when his preferred expert witness is not chosen. Their comparative litigation skills were not relevant to a discussion over whether a particular expert witness was a better choice. There is nothing in the record supporting that management was taking its actions based on Complainant's protected classes.

---

[307]     ROI at 321.

[308]     ROI at 48-49.

In response to Complainant's allegation that he was subject to "biased, discriminatory assumptions" in disputes, perceived as lacking credibility, and that management acted upon accusations against him without substantiation, S2 stated Complainant complained to her that the FEVS was racially biased and that he thought alternative management styles, including those by people of color, were not accounted for.[309] Complainant also complained to S2 about the preferential treatment of the honors attorney program.[310] S2 also stated she reached out to a Black Associate Solicitor to provide support at Complainant's urging.[311]

Managers are well within their rights to, among other things, direct an employee to work with their colleagues and direct them to follow agency policy and not retaliate. The record shows that numerous employees complained about Complainant's management and alleged retaliation and harassment. Complainant alleges the increased scrutiny he faced was because of his protected classes, but the record contradicts that. Management made the choices they did because his treatment of his employees was a problem. Numerous complaints were documented via e-mail, and they are consistent – many of Complainant's employees reached out to S1 in confidence, and expressed fear of Complainant's behavior and told very similar stories of bullying, favoritism, mismanagement and, importantly, of fear of retaliation for complaining about Complainant.

Complainant fails to offer any evidence to support his assertion that white employees are held to different standards than he is. In fact, the record evidence shows this assertion is not true – his performance standards, for example, were identical to other RSOLs. While Complainant alleges he has been labeled with racist stereotypes, he offers no support for that allegation other than his assertions. The Commission has long found that unsubstantiated assertions are insufficient as a matter of law to establish that the agency's explanation for its conduct is pretextual or that discrimination occurred.[312]

In sum, for the allegations above, Complainant did not offer evidence beyond his assertions to demonstrate that his protected characteristics are factors with respect to this claim. He claims, repeatedly, that other Black managers and employees have been targeted by SOL in the past. However, testimony from S1 and S2 refutes that claim and Complainant fails to provide specifics in order to show those refutations are pretextual. The clear weight of the evidence shows that management was dealing with an employee causing serious problems that created

---

[309]    ROI at 968.

[310]    ROI at 968.

[311]    ROI at 964, 968.

[312]    *See Hipolito P. v. Dep't of Veterans Affairs*, E.E.O.C. Appeal No. 2019001991, 2019 WL 1988313, at *3 (Apr. 26, 2019).

liability for the agency. Complainant's allegations do not provide evidence that management's asserted rationale was pretextual or that discrimination occurred based on Complainant's protected characteristics. Complainant has therefore failed to meet his burden of proof with respect to this claim. As such, I find that Complainant has failed to prove that he has been subjected to unlawful disparate treatment as he has alleged based on his race, gender, and/or prior EEO activity.

## B. Hostile Work Environment

> *DOL has subjected you to an ongoing pattern of discriminatory disparate treatment, including:*
>  a. *Stereotyped criticism, increased scrutiny, and repeatedly holding you to different standards than Caucasian attorneys: while DOL awards Caucasian attorneys for showing skills like trial advocacy, leadership, and obtaining victories for DOL, DOL penalizes you and Black attorneys for the same traits, labeling them with negative stereotypes such as aggressive, confrontational, angry, and overbearing.*
>  b. *Stereotyped criticism, increased scrutiny, and repeatedly holding you to different standards than Caucasian managers when you act in your managerial capacity, including assessing performance, making decisions about cases, work assignments, discipline and promotions.*
>  c. *Biased, discriminatory assumptions that when there are workplace disputes, Caucasian employees are believed, and the Black employees, including you, are lacking credibility, at fault, and/or have engaged in misconduct.*
>  d. *Subjecting Complainant to administrative investigations (conducted by DOL's OASAM/OHR/DELMR) regarding discriminatory allegations made by Caucasian staff, including in November 2022 and January 2023.*

Complainant alleges that he was subjected to a hostile work environment on the basis of race, sex and/or reprisal for prior EEO activity. Although his claim of "ongoing disparate treatment" did not specifically allege hostile work environment, I accepted his claim on that basis.

Harassment directed at an individual on these bases violates Title VII.[313] To establish a case of harassment based on a hostile work environment, a complainant must show that: (1) they belong to a protected class or classes; (2) they were subject

---

[313]    *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986); *Heath v. Gen. Servs. Admin*, E.E.O.C. Appeal No. 01963035, 1998 WL 546817, at *4 (Aug. 17, 1998).

to unwelcome verbal or physical conduct; (3) the conduct complained of was based on one or more of their protected categories; (4) the conduct unreasonably interfered with their work performance or created an intimidating, hostile, or offensive work environment, and (5) there is a basis for imputing liability to the employer. [314]

To satisfy the fourth prong of the hostile work environment analysis, courts have long held that the conduct at issue must be sufficiently "severe or pervasive" to create an objectively hostile work environment—an environment that "a reasonable person would find hostile or abusive." [315]

Complainant fails to show he was subjected to a hostile work environment. He fails to both establish that the complained of conduct was based on one or more of his protected categories and he fails to show that the conduct created a hostile work environment.

While Complainant characterizes many of his supervisors' actions as hostile, racist, and stereotyped, the record shows that his supervisors' actions were attempts to manage him. For several of his allegations, including that the employees complaining of Complainant's management were all white, the record does not support Complainant's allegation. One of the attorneys who complained of retaliation was Hispanic. The group of attorneys who banded together to provide common survey responses were not identified by race or otherwise.

Complainant alleges in part that the treatment of him was based on racist stereotypes. However, Complainant's conduct described in the record, and supported by the evidence, is that of a manager who does not respect his supervisor, does not take feedback, and does not treat his staff with respect. As discussed above, in the disparate treatment section, directing a subordinate employee to follow instructions is consistent with managers doing their jobs. All of Complainant's supervisors deny discriminating against Complainant because of his race, gender, or EEO activity.

Furthermore, Complainant has failed to allege facts of harassment that was sufficiently severe to rise to the level of a hostile work environment. The conduct that Complainant alleges as harassing was typical management of a subordinate

---

[314]   *McCleod v. Soc. Sec. Admin.*, E.E.O.C. Appeal No. 01963810, 1999 WL 643307, *3 (Aug. 5, 1999).

[315]   *Harris*, 510 U.S. at 21-22; *see also Smith v. Dep't of Veterans Affairs*, E.E.O.C. Appeal No. 01A40925, 2005 WL 2492808, at *4 (Sept. 28, 2005) (noting that a hostile environment claim generally requires a showing of a pattern of offensive conduct); *Munchbach v. U.S. Postal Serv.*, E.E.O.C. Appeal No. 01A11681, 2002 WL 1461210, at *2 (June 18, 2002) ("[C]laims of a few isolated incidents of alleged harassment usually are not sufficient to state a harassment claim.").

and teams of staff. An objectively reasonable person would not consider themselves harassed when their supervisor provides feedback to them and directs them to work with their colleagues. The Commission has found that conduct similar to and more severe than that complained of in this case, even if true, is not sufficiently severe or pervasive to constitute a legally actionable hostile work environment.[316] Complainant's allegations, without more, would not be sufficient to establish Complainant was subjected to a hostile work environment. Harassing conduct must be consistent and severe to warrant relief.[317]

For the reasons outlined above, I find that Complainant's working conditions neither so severe nor pervasive as to render the environment so intolerable that the conditions of Complainant's employment were altered. Although Complainant may disagree with management's actions, he has failed to set forth any facts to satisfy his burden of proof in connection with his allegations of a hostile work environment. Accordingly, Complainant has failed to prove his claim that management subjected him to a discriminatory hostile work environment.

## V. Conclusion and Statement of Relief

Complainant failed to establish that he was subjected to disparate treatment or a hostile environment based on his race, sex, and/or reprisal for prior EEO activity. Because the complaint is without merit, no relief is granted.

## VI. Statement of Notice and Rights

If you are not satisfied with this decision, your appeal rights are as follows:

You may file a notice of appeal with the Equal Employment Opportunity Commission (EEOC), at any time up to thirty (30) calendar days after your receipt of this decision. You may file your appeal online by using the EEOC Public Portal at https://publicportal.eeoc.gov/Portal/Login.aspx, by facsimile (faxes over 10 pages will not be accepted) to (202) 663-7022, or by mail to:

---

[316]     *Reece v. U.S. Postal Serv.*, EEOC Appeal No. 0120091011, 2009 WL 509567, at *1-3 (Feb. 20, 2009) (no actionable harassment where complainant was issued a disciplinary suspension, was denied FMLA leave, and was followed); *James v. U.S. Postal Serv.*, EEOC Appeal No. 0120062236, 2007 WL 2693689, at *1-2 (Sept. 7, 2007) (finding no actionable harassment where complainant was issued unsatisfactory performance evaluations and was berated by a supervisor, culminating in termination).

[317]     *King v. Hillen*, 21 F.3d 1572 (Fed. Cir. 1994); *Harris Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (a pattern of offensive conduct is required to prevail on a hostile work environment claim).

Equal Employment Opportunity Commission
Office of Federal Operations
P.O. Box 77960
Washington, D.C. 20013

You may also hand-deliver an appeal to:

Director, Office of Federal Operations,
Equal Employment Opportunity Commission,
131 M Street, NE, Suite 5SW12G,
Washington, DC 20507

Any statement in support of the appeal must be submitted to the Office of Federal Operations and to this office within thirty (30) calendar days of your filing of the notice of appeal. The regulations at 29 C.F.R. § 1614.403(a) encourage the use of EEOC Form 573 in presenting an appeal to the EEOC, and a copy of this form is enclosed.

If you elect not to appeal to the Commission, you may file a civil action in an appropriate U.S. District Court within ninety (90) calendar days of your receipt of this decision. If you file an appeal with the Commission, you may still file a civil action in the appropriate U.S. District Court within ninety (90) calendar days of your receipt of the Commission's final decision on your appeal. A civil action may also be filed any time after one hundred and eighty (180) days from the date of filing your appeal with the Commission, if the Commission's Office of Federal Operations has not issued a final decision.

You are also advised that if you file a civil action, you must name the appropriate Department Head as the defendant. Department means the national organization, and not just the local office, facility or department in which you may work. Do not just name the Agency or department. In your case, you must name Julie Su, Acting Secretary of Labor, as the defendant. You must also state the official title of the department head. Failure to provide the name or official title of the agency head or department head may result in dismissal of your case.

*Susan Harthill*

_____
**Susan Harthill**
**Chief Administrative Appeals Judge**
**Administrative Review Board**